

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

BBX CAPITAL CORPORATION,　　)
　　　　　　　　　　　　　　　)
　　　　　　Appellant,　　　　)
　　　　　　　　　　　　　　　)
　　v.　　　　　　　　　　　　)　　　　WD86632
　　　　　　　　　　　　　　　)
SCOTTSDALE INSURANCE　　　　)　　　　Opinion filed:  April 1, 2025
COMPANY, ET AL.,　　　　　　　)
　　　　　　　　　　　　　　　)
　　　　　　Respondents.　　　)

### APPEAL FROM THE CIRCUIT COURT OF
### JACKSON COUNTY, MISSOURI
### THE HONORABLE CHARLES H. MCKENZIE, JUDGE

Division Three:  W. Douglas Thomson, Presiding Judge, Karen King Mitchell,
Judge and Thomas N. Chapman, Judge

BBX Capital Corporation ("BBX")[1] appeals from a judgment on the pleadings granted in favor of several defendant insurance companies ("Insurers") on BBX's insurance coverage claims arising from alleged losses due to the COVID-

---

[1] Originally, two plaintiffs brought this action: Bluegreen Vacations Holding Corp., f/k/a BBX Capital Corporation ("Bluegreen") and BBX Capital, Inc.  Both corporations stem from BBX Capital Corporation, which separated into the two corporations effective October 1, 2020.  After the commencement of this appeal, Bluegreen dismissed its claims in same.  Accordingly, BBX Capital, Inc. is the only Appellant in this appeal.  We recognize that this is not reflected in the caption of the case, which lists the Appellant as BBX Capital Corporation.  Nevertheless, we will go by the case caption.  For ease of understanding, we will also refer to Appellant, as well as both of the original plaintiffs collectively, as "BBX."

19 pandemic.[2] BBX brings three Points on Appeal. BBX first claims that the trial court wrongly concluded that provisions of coverage afforded by a Loss of Attraction Endorsement under certain Insurers' policies were negated by certain exclusions. BBX also contends that the trial court wrongly interpreted this Loss of Attraction Endorsement and the $5,000,000 sub-limit applicable to same. Lastly, BBX asserts that the trial court wrongly interpreted the phrase "direct physical loss of or damage to" property within certain coverage provisions as requiring "a tangible impact that physically alters real or personal property." We affirm in part, and reverse and remand in part.

---

[2] Insurers include Arch Specialty Insurance Company ("Arch"), Scottsdale Insurance Company ("Scottsdale"), Endurance American Specialty Insurance Company ("Endurance"), Interstate Fire & Casualty Company ("Interstate"), Ironshore Specialty Insurance Company ("Ironshore"), Certain Underwriters at Lloyd's, London subscribing to policy number W223D2190201 ("Beazley"), Allied World Assurance Company (US) Inc. ("Allied World"); AXIS Surplus Insurance Company ("AXIS"); Evanston Insurance Company ("Evanston"); Everest Indemnity Insurance Company ("Everest"); Starr Surplus Lines Insurance Company ("Starr"); Westchester Surplus Lines Insurance Company ("Westchester"); Certain Underwriters at Lloyd's, London subscribing to policy number AQS-190453 ("Lloyd's"), HDI Global Specialty SE ("HDI"), General Security Indemnity Company of Arizona ("General Security") with respect to policy number TR00093911900453, Crum & Forster Specialty Insurance Company ("Crum & Forster"), Western World Insurance Company ("Western World"), and Safety Specialty Insurance Company ("Safety Specialty") (collectively, the "SRU Insurers"); and QBE Specialty Insurance Company ("QBE"), General Security with respect to policy number TR00202191601033, and Starstone Specialty Insurance Company ("Starstone") (collectively, the "Arrowhead Insurers").

One other insurance company was also included among the original defendants: People's Insurance Company of China (Hong Kong) Ltd. ("PICC"). However, PICC was never served with process, never filed an appearance in the underlying case nor appeared to defend itself, and BBX sought no further action against PICC. Following the commencement of this appeal, PICC was dismissed as a party in the underlying case by order of the trial court. Accordingly, PICC is not a party to this appeal and will not be discussed herein, other than what is necessary in reciting this case's procedural history.

**Factual and Procedural History[3]**

BBX is a corporation organized and existing under the laws of Florida, with its principal place of business in Fort Lauderdale, Florida. BBX has 284 business properties located throughout the United States, including in Missouri, where BBX has extensive contacts and business. BBX's business properties include vacation resorts and timeshare properties, and retail stores selling chocolate and other confectionery products.

To protect its businesses against property damage and business interruptions, BBX purchased "all-risk" property insurance policies from several insurance companies, who provide either primary or excess insurance coverage under same (the "Policies"). The policy period for such coverage ran from April 1, 2019 to April 1, 2020. Those Insurers providing coverage at the primary layer include Arch, Scottsdale, Endurance, Interstate,[4] Ironshore,[5] and Beazley (collectively, "Primary Insurers"). Making up the excess layer of insurance coverage are Allied World,[6] AXIS, Evanston, Everest, Starr, Westchester,

---

[3] "The well-pleaded facts of the non-moving party's pleading are treated as admitted for purposes of the motion." *Eaton v. Mallinckrodt, Inc.*, 224 S.W.3d 596, 599 (Mo. banc 2007) (citing *State ex rel. Nixon v. Am. Tobacco Co.*, 34 S.W.3d 122, 134 (Mo. banc 2000)).

[4] Interstate's Policy provides both primary and excess insurance coverage.

[5] Ironshore's Policy is not included in the record on appeal. While the Policy was purportedly attached to the Petition as Exhibit E, this exhibit is in fact the policy of a different insurer.

[6] Allied World was incorrectly listed as a primary insurer on the Master Policy's Participation Page.

Interstate, the SRU Insurers, and the Arrowhead Insurers (collectively, "Excess Insurers").

The Policies collectively provide up to $150,000,000 in combined limits, with each Insurer responsible for paying its own specified "Participation Limit." Each Policy is constructed around a master form, consisting of fifty-two pages of common provisions and twelve endorsements (the "Master Policy"). Each Insurer then separately added declarations pages and endorsements modifying the provisions of the Master Policy to create their own individual Policies.

Importantly, the Master Policy provides the following Perils Insured Against Provision:

### 9. PERILS INSURED AGAINST

This policy insures against ***all risk of direct physical loss of or damage*** occurring during the period of insurance to property described herein including general average, salvage and all other charges on shipments covered hereunder, except as hereinafter excluded.

(Emphasis added).[7] The property covered by the Master Policy is described in Clause 7.A., in relevant part, as follows:

(1) The interest of the Insured in real and personal property including but not limited to property owned, used, leased or intended for use by the

---

[7] The SRU Policy does not include this provision, but instead states:

Subject to the limitations, terms, and conditions contained in this Policy or added hereto, the Insurer(s) agree to indemnify the Assured named in the Schedule herein in respect of Direct Physical "loss" or damage to the property described in Item 7 of the Schedule, while located or contained as described in the Schedule, occurring during the effective "policy period" stated in the Declaration and caused by any such perils as are set forth in Item 5 of the Schedule and which are also covered by and defined in the Policy/ies specified in the Schedule and issued by the Primary Insurer(s) stated therein.

Nevertheless, Items 5 and 7 in the "Schedule" refer to the Perils Insured and Property as defined in the Arch Policy, which is as set forth in the Master Policy.

Insured, or hereafter constructed, erected, installed, or acquired, including while in course of construction, erection, installation and assembly. In the event of loss or damage, this Company agrees to accept and consider the Insured as sole and unconditional owner of improvements and betterments, notwithstanding any contract or leases to the contrary.

At issue in this appeal are certain coverage provisions contained within the Master Policy, specifically Business Interruption, Extra Expense, Rental Value, Contingent Time Element, Leader Property,[8] Interruption by Civil or Military Authority, Ingress/Egress, Leasehold Interest, and Protection and Preservation of Property (collectively, the "Master BI coverages").[9] Business Interruption coverage, in relevant part, is as follows:

> (1) Loss resulting from necessary interruption of business conducted by the Insured, whether total or partial, and **caused by physical loss, damage, or destruction covered herein** during the term of this policy to real and personal property as described in Clause 7.A.

(Emphasis added). In pertinent part, Extra Expense coverage is also provided:

> (1) Necessary and reasonable Extra Expense incurred **resulting from physical loss, damage, or destruction covered herein** during

---

[8] While this provision was quoted within BBX's Petition, it is not discussed by the parties on appeal.

[9] All of the Policies, except for the SRU Policy, contain the policy language set forth herein. The SRU Policy states,

> In respect of the perils hereby insured against, this Policy is subject to the same warranties, terms and conditions except as regards the premium, the amount and Limit of Liability other than the deductible or self-insurance provision where applicable, and the renewal agreement, if any, AND EXCEPT AS OTHERWISE PROVIDED HEREIN as are contained in or may be added to the Policy/ies of the Primary Insurer(s) prior to the happening of a "loss" for which claim is made hereunder. Should any alteration be made in the premium or coverage for the Policy/ies of the Primary Insurer(s), the notice of such alteration shall be forwarded to the Insurer(s) and the premium or coverage hereon may be adjusted accordingly.

Additionally, the SRU Policy excluded Contingent Business Interruption coverage via endorsement.

5

the term of this policy to real or personal property as described in Clause 7.A.

(2) "Extra Expense" means the excess of the total cost chargeable to the operation of the Insured's business over and above the total cost that would normally have been incurred to conduct the business had no loss or damage occurred. . . .

(Emphasis added). Rental Value provides, in relevant part:

(1) Rental Value loss sustained by the insured ***resulting directly from physical loss, damage, or destruction covered herein*** during the term of this policy to real and personal property as described in Clause 7.A. but not exceeding the reduction in rental value less charges and expenses which do not necessarily continue.

(2) "Rental Value" is defined as the sum of:

(a) the total anticipated gross rental income from tenant occupancy of the described property as furnished and equipped by the Insured; and

(b) the amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be obligations of the Insured; and

(c) the fair rental value of any portion of said property which is occupied by the Insured.

(Emphasis added). Coverage for Contingent Time Element, Leader Property, Interruption by Civil or Military Authority, and Ingress/Egress are provided under the Time Element Extensions provision, as follows:

**G. Time Element Extensions**

(1) This policy, subject to all provisions and without increasing the limits of this policy, also insures against loss ***resulting from damage to or destruction by causes of loss insured against***, to:

. . .

6

(b)    Contingent Time Element: property of the type not otherwise excluded that wholly or partially prevents any direct or indirect supplier of goods and/or services to the Insured from rendering their goods and/or services, or property that wholly or partially prevents any direct or indirect receiver of goods and/or services from the Insured from accepting the Insured's goods and/or services, such supplier or receiver to be located anywhere in the world;

. . .

(d)    Leader Property: property of the type not otherwise excluded not owned or operated by the Insured, located in the same vicinity as the Insured, which attracts business to the Insured.

(2)    Interruption by Civil or Military Authority: This policy covers the Actual Loss Sustained and Extra Expense incurred by the Insured due to the necessary interruption of the Insured's business due to the prevention of access to the Insured location by order of a civil or military authority, provided that such order is a ***direct result of physical damage of the type insured by this policy***, to the kind of property not excluded by this policy situated within five (5) miles of the Insured Location.

(3)    Ingress/Egress: This policy covers the Actual Loss Sustained and Extra Expense incurred by the Insured due to the necessary interruption of the Insured's business due to the prevention of ingress to or egress from an Insured Location, whether or not the premises or property of the Insured is damaged, provided that such prevention is a ***direct result of physical damage*** of the type insured by this policy, to the kind of property not excluded by this policy situated within five (5) miles of the Insured Location.

The Leasehold Interest provision covers, in relevant part:

(1)    Pro rata proportion from the date of loss to expiration date of the lease (to be paid without discount) on the Insured's interest in:

(a)    the amount of bonus paid by the Insured for the acquisition of the lease not recoverable under the terms of the lease;

7

(b) improvements and betterments to real property which are not covered under any other section of this policy;

(c) the amount of advance rental paid by the Insured and not recoverable under the terms of the lease;

when property is rendered wholly or partially untenantable by any covered loss during the term of this policy and the lease is canceled by the party not the Named Insured under this policy in accordance with the conditions of the lease or by statutory requirements of the appropriate jurisdiction in which the damaged or destroyed property is located[.]

Lastly, coverage under the Protection and Preservation of Property provision is as follows:

**31. <u>PROTECTION AND PRESERVATION OF PROPERTY</u>**

This policy covers reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, ***insured physical loss or damage to such insured property***.

This Additional Coverage is subject to the deductible provisions that would have applied had the physical loss or damage occurred.

(Emphasis added).

In addition to these Master BI coverage provisions, this appeal also concerns Endorsement 11 of the Master Policy, which is the Loss of Attraction Endorsement. All of the Insurers, except for Ironshore and Beazley, include the Loss of Attraction Endorsement in their Policies. Said Endorsement provides, in relevant part:

**Loss of Attraction Endorsement**

This policy is extended to cover the actual loss sustained and Extra Expense Incurred resulting from cancellation of or inability to accept bookings for accommodation and/or a cessation or diminution of trade due to a loss of potential customers, as a direct result of:

8

. . .

2) Infectious, communicable or contagious disease.

. . .

4) closing of the whole or part of the premises of the Insured by order of a Public Authority consequent upon the existence or threat of hazardous conditions either actual or suspected at an Insured Location to the extent such closure is not otherwise covered elsewhere under this Policy such as under the Civil or Military Authority Extension[.]

. . .

The Loss of Attraction Endorsement is sub-limited at $5,000,000 per occurrence.

BBX sought to receive coverage under these various provisions for COVID-19 pandemic-related losses suffered by its Insured Properties. On March 13, 2020, BBX provided timely notice of its claim under the Policies to the Insurers. The Insurers thereafter either denied BBX's claim or sent reservation of rights letters. BBX subsequently filed its Petition, asserting three causes of action: Declaratory Judgment, Breach of Contract, and Vexatious Refusal to Pay.

BBX's Petition alleges in part that "[t]he ubiquitous presence and pandemic spread of SARS-CoV-2[] and consequent orders of civil authorities have caused direct physical loss of or damage to property in this country, including high-volume commercial businesses such as the Insured Properties." The Petition states "COVID-19 is an infectious disease known as the 'novel coronavirus' caused by the SARS-CoV-2 virus" and alleges that "SARS-CoV-2 and COVID-19 caused direct physical loss of or damage to the Insured Properties and surrounding properties,

9

by altering the physical conditions of the properties so that they were no longer safe or fit for occupancy or use."

The Petition alleges that "SARS-CoV-2 attaches itself to surfaces and properties, thereby producing physical change in the condition of the surfaces and properties – from safe and touchable to unsafe and deadly." Specifically, the Petition states "SARS-CoV-2 is contained in respiratory droplets" which are "expelled from infected individuals" and "land on, attach, and adhere to surfaces and objects and physically change these once safe surfaces to 'fomites'", i.e. "objects, previously safe to touch, that now serve as agents and mechanisms for transmission of deadly, infectious diseases." The Petition states "people can become infected with COVID-19 by touching fomites, then touching their eyes, nose, or mouth." Similarly, the Petition states that "the transmissibility of SARS-CoV-2 and COVID-19 within enclosed areas, such as the Insured Properties, renders the air within buildings no longer safe to breathe."

The Petition alleges "[t]he coronavirus remains active and dangerous on some surfaces for weeks after infected persons have left a location," as well as that "SARS-CoV-2 virions may be detected in aerosols for up to three hours, on plastic and stainless steel for up to three days, and on cardboard for twenty-hour hours." The Petition states "SARS-CoV-2 virions cannot be eliminated by routine cleaning," as the cleaning of surfaces in indoor spaces will not remove aerosolized COVID-19 particles from the air. The Petition further alleges SARS-CoV-2 was physically present at the Insured Properties, or it was "statistically-indisputable"

that it was present, as were individuals who contracted or suffered from COVID-19, including confirmed positive COVID-19 infections of employees at the Insured Properties.

Additionally, the Petition alleges that "state and local governments issued 'stay at home' orders and orders closing or limiting access to non-essential businesses." The Petition states that the Insured Properties have "been the subject of one or more shut-down, stay at home or civil authority orders emanating from emergency orders first promulgated by the Governors of each state in which it does business[.]" The Petition alleges "[t]hese orders required many retail properties and businesses, including many of the Insured Properties, to close their doors or severely limit and/or prohibit access to the public[.]" The Petition further states that "these orders imposed operating restrictions constituting a direct physical loss of property on their premises by limiting their use or full use of their physical space." BBX estimates its total losses as exceeding $150,000,000 as a direct result of the pandemic and/or shut down orders.

All Insurers, except for PICC, moved for Judgment on the Pleadings in a joint motion, seeking therein either full or partial dismissal of the Petition. In addition to filing joint suggestions in support of each motion, Insurer-specific supplemental suggestions were also filed. Thereafter, additional pleadings were filed by both BBX and the Insurers. Oral arguments were held on December 9, 2022 and February 22, 2023.

11

On June 30, 2023, the trial court entered its order and judgment granting the Insurers' Motion for Judgment on the Pleadings. The trial court determined that BBX's claims based on direct physical loss or damage fail as a matter of law, and therefore dismissed with prejudice BBX's claims for Business Interruption, Extra Expenses, Interruption by Civil Authority, Ingress/Egress, Contingent Time Element, and Protection and Preservation of Property against all Insurers.[10] The trial court also dismissed with prejudice BBX's claims against all Insurers, except Arch and PICC, based on Loss of Attraction coverage "as the claims are barred by exclusions and because certain Defendants' policies attach above the Loss of Attraction sublimit." Further, the trial court ordered that BBX's third cause of action for vexatious refusal to pay, as related to and dependent on BBX's claims for direct physical loss, was dismissed as to all Insurers with prejudice, and likewise that the third cause of action for vexatious refusal to pay, as related to and dependent on BBX's claims for Loss of Attraction coverage, was dismissed as to all Insurers, except Arch and PICC, with prejudice.

On July 28, 2023, BBX moved the trial court to certify the June 30, 2023 judgment as final for appeal under Rule 74.01(b). BBX alleged the judgment disposed of the action as to all parties, except as to Arch, who had not moved for

---

[10] In its judgment, the trial court failed to make a finding as to BBX's claims under Rental Value, Leader Property, and Leasehold Interest coverage. However, because of its holding that BBX's "claims based on direct physical loss or damage fails as a matter of law[,]" we find that the dismissal of BBX's claims under these coverage provisions was implied.

judgment on the pleadings as to Loss of Attraction coverage.[11]  BBX also alleged the judgment was not entered as to PICC because PICC "never filed an appearance in this case, nor appeared to defend itself in the case,"[12] as the judgment itself noted.  Arch filed a response to the motion, in which it stated it did not oppose the motion to certify.  On September 27, 2023, the trial court issued an Order and Judgment in which it granted BBX's motion and "revise[d] and amend[ed] the Order and Judgment dated June 30, 2023 to include an express determination that there is no just reason for delay under Rule 74.01(b)."

BBX appeals.  Additional facts will be included below, as necessary.

**Standard of Review**

Missouri law governs our standard of review.  *See Allstate Fire and Cas. Ins. Co. v. Stratman*, 620 S.W.3d 228, 231-32 (Mo. App. W.D. 2020).  "'A court's grant of judgment on the pleadings is reviewed *de novo*.'"  *Id.* at 232 (quoting *Bell v. Phillips*, 465 S.W.3d 544, 547 (Mo. App. W.D. 2015)).  "The trial court's ruling is reviewed in order to decide 'whether the moving party is entitled to judgment as a matter of law on the face of the pleadings.'"  *Campbell v. Baxter Int'l, Inc.*, 697 S.W.3d 36, 40 (Mo. App. E.D. 2024) (quoting *Gross v. Parson*, 624 S.W.3d 877, 883 (Mo. banc 2021)).

---

[11] Arch had instead opted to pay under the Loss of Attraction coverage on a one-occurrence basis, partly because, unlike the other Insurers, it failed to include an applicable exclusion in Endorsement 1, as counsel explained at the February 22 hearing. The significance of Endorsement 1 is discussed in the analysis below.

[12] *See supra* n.2.

"Judgment on the pleadings is appropriate where the question before the court is strictly one of law." *Eaton v. Mallinckrodt, Inc.*, 224 S.W.3d 596, 599 (Mo. banc 2007) (citing *RGB2, Inc. v. Chestnut Plaza, Inc.*, 103 S.W.3d 420, 424 (Mo. App. S.D. 2003)). "The well-pleaded facts of the non-moving party's pleading are treated as admitted for purposes of the motion." *Id.* (citing *State ex rel. Nixon v. Am. Tobacco Co.*, 34 S.W.3d 122, 134 (Mo. banc 2000)). "However, this Court does not blindly accept legal conclusions within the pleadings[.]" *Campbell*, 697 S.W.3d at 40 (citing *Gross*, 624 S.W.3d at 883). "'The position of a party moving for judgment on the pleadings is similar to that of a movant on a motion to dismiss; i.e., assuming the facts pleaded by the opposite party to be true, these facts are, nevertheless, insufficient as a matter of law.'" *Nixon*, 34 S.W.3d at 134 (quoting *Madison Black Pharmacy v. U.S. Fidelity*, 620 S.W.2d 343, 345 (Mo. banc 1981)). "[W]e will affirm the judgment when it is supported by any theory, regardless of the reasons given by the trial court." *Campbell*, 697 S.W.3d at 40 (citing *Gross*, 624 S.W.3d at 883). However, judgment on the pleadings, as a matter of law, is not appropriate where the pleadings raise a question of material fact. *See Eaton*, 224 S.W.3d at 600-01.

## Choice of Law

BBX, though domiciled in Florida, brought this action in Missouri. Accordingly, we must first decide which State's substantive law governs as to the interpretation of insurance policies before we address the merits of BBX's appeal. In its judgment, the trial court found there was no conflict between Florida and

14

Missouri law on the issues to be decided, and thus held Missouri substantive law applied. The parties do not dispute this holding on appeal.

"The question of which State's law to apply is . . . a question of law, subject to de novo review." *Wilson v. Image Flooring, LLC*, 400 S.W.3d 386, 391 (Mo. App. W.D. 2013) (citations omitted). "In deciding the substantive law which will apply, Missouri courts use Missouri's choice of law rules." *Stratman*, 620 S.W.3d at 233 (citing *Interstate Cleaning Corp. v. Commercial Underwriters Ins. Co.*, 325 F.3d 1024, 1028 (8th Cir. 2003)). "When a conflict of law exists, Missouri evaluates which law should govern according to the Restatement (Second) of Conflicts of Laws." *Rider v. The Young Men's Christian Ass'n of Greater Kansas City*, 460 S.W.3d 378, 388 (Mo. App. W.D. 2015) (citing *Hicks v. Graves Truck Lines, Inc.*, 707 S.W.2d 439, 444 (Mo. App. W.D. 1986)). However, "[u]nder Missouri law, a conflict of laws does not exist 'unless the interests of the two states cannot be reconciled.'" *Interstate Cleaning Corp.*, 325 F.3d at 1028 (quoting *Brown v. Home Ins. Co.*, 176 F.3d 1102, 1105 (8th Cir. 1999) (citing *State ex rel. Broglin v. Nangle*, 510 S.W.2d 699, 703 (Mo. banc 1974))). When no conflict of law exists, Missouri law applies. *Id.*

Here, no conflict of laws exists between Florida and Missouri. Indeed, Florida and Missouri apply the same principles in interpreting insurance policies. *Compare Sachtleben v. Alliant Nat'l Title Ins. Co.*, 687 S.W.3d 624, 629-30 (Mo. banc 2024) *with Washington Nat'l Ins. Corp. v. Ruderman*, 117 So.3d 943, 948 (Fla. 2013) (general rules of construction); *Burns v. Smith*, 303 S.W.3d 505, 509

15

(Mo. banc 2010) *with Penzer v. Transp. Ins. Co.*, 29 So.3d 1000, 1005 (Fla. 2010) (ambiguous policy language); *Grable v. Atl. Cas. Ins. Co.*, 280 S.W.3d 104, 108 (Mo. App. E.D. 2009) *with Panettieri v. People's Trust Ins. Co.*, 344 So.3d 35, 38 (Fla. Dist. Ct. App. 2022) (endorsement controls in event of conflict with general policy provisions); *Messina v. Shelter Ins. Co.*, 585 S.W.3d 839, 843 (Mo. App. W.D. 2019) *with State Farm Fire and Cas. Co. v. Castillo*, 829 So.2d 242, 244-45 (Fla. Dist. Ct. App. 2002) (interpretation of exclusionary clauses). There being no conflict of law, we will apply Missouri law.

## Insurance Policy Interpretation

"The interpretation of an insurance policy, and the determination whether coverage and exclusion provisions are ambiguous, are questions of law that this Court reviews *de novo*." *Burns*, 303 S.W.3d at 509 (citing *Seeck v. Geico Gen. Ins. Co.*, 212 S.W.3d 129, 132 (Mo. banc 2007); *Martin v. U.S. Fidelity & Guar. Co.*, 996 S.W.2d 506, 508 (Mo. banc 1999)).

> "When interpreting an insurance policy, this Court gives the policy language its plain meaning, or the meaning that would be attached by an ordinary purchaser of insurance." [*Seaton v. Shelter Mut. Ins. Co.*, 574 S.W.3d 245, 247 (Mo. banc 2019)] (internal quotation omitted). "Definitions, exclusions, conditions and endorsements are necessary provisions in insurance policies." *Id.* (internal quotation omitted). "A policy must be enforced as written when its language is clear and unambiguous." *Id.* "An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy." *Id.* (internal quotation omitted). "Courts may not unreasonably distort the language of a policy or exercise inventive powers for the purpose of creating an ambiguity when none exists." *Todd v. Mo. United Sch. Ins. Council*, 223 S.W.3d 156, 163 (Mo. banc 2007). "Insurance policies are read as a whole, and the risk insured against is made up of both the general insuring agreement as well as the exclusions and

definitions." *Owners Ins. Co. v. Craig*, 514 S.W.3d 614, 617 (Mo. banc 2017) (internal quotation omitted).

*Sachtleben*, 687 S.W.3d at 629-30. "Rules of construction are, however, *only* to be utilized where an ambiguity *already exists*." *Shiddell v. Bar Plan Mut.*, 385 S.W.3d 478, 485 (Mo. App. W.D. 2012) (emphasis added) (citing *Kelly v. Marvin's Midtown Chiropractic, LLC*, 351 S.W.3d 833, 836 (Mo. App. W.D. 2011)).

We address BBX's Points on Appeal out of order, beginning with Point III.

## Point III

In its third Point on Appeal, BBX contends the trial court erred in granting Insurers' motions for judgment on the pleadings because the court "wrongly interpreted the phrase direct physical loss of or damage to property as requiring 'a tangible impact that physically alters real or personal property[.]'" BBX argues this "conclusion directly conflicts with this Court's contrary holding in *Cincinnati Ins. Co. v. German St. Vincent Orphan Ass'n, Inc.*, 54 S.W.3d 661 (Mo. App. [E.D.] 2001), and other decisions applying Missouri law."

There is no dispute that direct physical loss of or damage to property must have occurred for BBX to receive coverage under the Master BI coverages. Thus, the dispositive issue on this Point is whether BBX has sufficiently alleged the requisite direct physical loss of or damage to the Insured Properties by alleging the presence of SARS-CoV-2 and COVID-19 at its properties and the various governmental orders issued in the jurisdictions in which such properties are located. The phrase "direct physical loss of or damage" is not defined in the Policies. Nevertheless, it is plain from this language that the "loss" or "damage" to

17

the covered property must have been "direct" and "physical."  The pertinent language here is the modifier "physical."

To determine the ordinary meaning of said term, we turn to the dictionary. *See Doe Run Res. Corp. v. Am. Guarantee & Liab. Ins.*, 531 S.W.3d 508, 512 (Mo. banc 2017) (citing *Schmitz v. Great Am. Assur. Co.*, 337 S.W.3d 700, 708 (Mo. banc 2011)).  "Physical" is defined as "of or relating to natural science" or "having material existence: perceptible especially through the senses and subject to the laws of nature" or "of or relating to material things."  *Physical*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/physical (last visited Mar. 21, 2025).  Notably, "tangible" is a synonym of "physical."  *Physical*, MERRIAM-WEBSTER.COM THESAURUS, https://www.merriam-webster.com/thesaurus/physical (last visited Mar. 21, 2025).  Accordingly, the loss or damage to the property must be directly material, perceptible, or tangible.

Several federal cases applying Missouri law in the COVID-19 context have interpreted similarly-worded or identical policy language and ultimately dismissed claims like BBX's here.  For example, in *Zwillo V, Corp. v. Lexington Ins. Co.*, 504 F.Supp.3d 1034 (W.D. Mo. 2020), the term "direct physical loss of or damage to" property used in an "all-risk" policy was interpreted as requiring "physical alteration of property, or, put another way, a tangible impact that physically alters property."  *Id.* at 1039.  Based on such language, the court held:

> Whether the complaint is couched in terms of COVID-19's presence on the premises or of loss of use of premises due to the stay-at-home orders (or the virus itself), Plaintiff has failed to state a claim upon which relief may be granted because the policy does not cover the alleged claim.

*Id.* at 1041. *See also e.g., Seoul Taco Holdings, LLC v. Cincinnati Ins. Co.*, 538 F.Supp.3d 926, 933 (E.D. Mo. 2021) (agreeing with *Zwillo* in interpreting "direct physical loss"); *Club Pilates Franchise LLC v. Arch Ins. Co.*, 596 F.Supp.3d 1224, 1233 (W.D. Mo. 2022) ("[T]he majority of district courts that have considered similar insurance coverage phrases and similar business interruption allegations have held that the presence of COVID-19 on property is not a direct physical loss or damage to property because there results no physical alteration to the property."); *Glenn R. Edwards, Inc. v. Travelers Companies, Inc.*, No. 4:20-cv-00877-MTS, 2021 WL 3525168, at * 3 (E.D. Mo. 2021) (agreeing with *Zwillo* in interpreting "direct physical loss of" property), *aff'd by Glen R. Edwards, Inc. v. Travelers Cas. Ins.*, No. 21-3035, 2022 WL 1510818 (8th Cir. 2022) (per curiam).

Where, as here, there is an absence of Missouri state caselaw on this issue in the COVID-19 context, we find such federal cases persuasive. This is especially true in light of the Policies' "Period of Recovery" provision applicable to Business Interruption, Extra Expense, and Rental Value coverage. Said provision states:

> The length of time for which loss may be claimed:
>
> (a)   shall not exceed such length of time as would be required
>
> > (i)   with the exercise of due diligence and dispatch to **rebuild, repair, or replace the property that has been destroyed or damaged**;

> (ii) to restore the interrupted services to the premises and premise made ready for normal operations when such interruption is caused by an accidental occurrence.
>
> (b) and, such additional length of time to restore the Insured's business to the condition that would have existed had no loss occurred, commencing with the later of the following dates:
>
> (i) the date on which the liability of the Company for loss or damage would otherwise terminate; or
>
> (ii) the date on which ***repair, replacement, or rebuilding of the property that has been damaged*** is actually completed;
>
> but in no event for more than 180 days from said later commencement date;
>
> (c) with respect to alterations, additions and property while in the course of construction, erection, installation, or assembly shall be determined as provided in subparagraph (a) above, but such determined length of time shall be applied to the experience of the business after the business has reached its planned level of production or level of business operations;
>
> (d) shall commence with the date of such loss or damage and shall not be limited by the date of expiration of this policy or cancellation date.

(Emphasis added). By including this emphasized language, the Policies clearly contemplate a physical alteration of or tangible impact on the property.

In applying the plain language of the Policies and the above-stated caselaw, we find BBX has failed to allege "direct physical loss of or damage to" its properties. BBX alleges that the presence of "SARS-CoV-2 and COVID-19 caused direct physical loss of or damage to the Insured Properties and surrounding properties, by altering the physical conditions of the properties so that they were no longer safe or fit for occupancy or use." Specifically, BBX claims that in attaching itself to surfaces and properties, and by remaining in the air, SARS-CoV-2 physically

20

changes said surfaces, properties, and air by making them unsafe, thereby rendering "buildings and properties damaged, lost, unfit, and uninhabitable for occupancy or use." BBX also alleges that the physical presence of SARS-CoV-2 at the Insured Properties was "statistically-indisputable."

However, this is not the "physical loss of or damage to" property contemplated by the Policies. BBX has not pled any physical alteration or tangible impact to any property caused by SARS-CoV-2 or COVID-19. Nor was there any damage or loss alleged that required rebuilding, repair, or replacement of property. At the most, BBX simply alleges it undertook "remediation measures" by "repairing and replacing air filtration systems, remodeling and reconfiguring physical spaces, upgrading HVAC and ventilation systems, installing Plexiglass barriers . . . and purchasing and installing equipment and software to implement a 'contactless' guest experience for hotel guests." As alleged, however, these measures were taken as steps to reduce or stop the transmission of SARS-CoV-2 and COVID-19, not because of any "physical loss of or damage to" the properties.

BBX has also failed to allege "direct physical loss of or damage to" property with respect to the state and local "stay at home," "shut down," and other civil authority orders. With respect to such orders, BBX alleges they were issued "in response to the damage being inflicted on property, and to protect the public from further exposure to infected areas and damaged property as well as to prevent person to person airborne transmission within enclosed spaces[.]" BBX also alleges these orders "imposed physical limits on the Insured Properties by

imposing limits on the use of their physical spaces, including retail and lodging spaces," and that such physical limitations "constitute physical loss of property at the Insured Properties that is not excluded under the Policies." More specifically, BBX alleges it "was forced to suspend or reduce its business activities at the Insured Properties because the civil authority orders prohibited BBX's full access to the Insured Properties by imposing physical limits on their use, including but not limited to, restricting or prohibiting business operations or building occupancy."

However, the limit or even loss of use of the Insured Properties does not involve any physical alteration or tangible impact on said properties. *See Zwillo*, 504 F.Supp.3d at 1039-40. "[T]he term 'direct physical loss of or damage to' does not encompass simple deprivation of use." *Id*. at 1040. Again, we find these decisions persuasive. Moreover, the Policies expressly *exclude* "[l]oss of market or loss of use." As such, BBX's additional allegations that the "All-Risk Insurance Companies agreed to indemnify BBX for physical loss of use of property," as well as that the presence of SARS-CoV-2 and COVID-19 "has also directly resulted in loss of use of those facilities," are explicitly refuted or barred by the Policies. Indeed, BBX has failed to allege any physical alteration or tangible impact on the Insured Properties that has caused a loss of use of said properties.

BBX attempts to avoid this result by arguing the above caselaw is contrary to applicable Missouri precedent. Specifically, BBX points to our Eastern District's

22

decision in *German St. Vincent* as the controlling law on this issue. However, *German St. Vincent* does not alter our conclusion.

First, while the policy at issue in *German St. Vincent* included the term "direct physical loss of or damage" to property, the Eastern District included no discussion interpreting said term. Instead, the issues on appeal involved a pollution exclusion, whether a vehicle was a specified cause of loss under the policy, and whether a dust limitation in the policy applied to damages caused by the spread of asbestos. 54 S.W.3d at 663. Regardless, in deciding the specified cause of loss issue, the Eastern District noted the insurer's argument that "the threshold requirement of a 'direct physical loss' under the policy is met *when an item of tangible property has been physically altered* by a 'specified cause[] of loss,'" buttressing our position. *Id.* at 666 (alteration in original) (emphasis added).

This is the same interpretation BBX claims is erroneous. Significantly, rather than expressly rejecting this argument as BBX asserts, the Eastern District chose not to address this interpretation, instead concluding "that the damage caused by the release of asbestos resulting from the . . . floor scraper's, removal of the old flooring is a 'specified cause[] of loss' . . . ." *Id.* at 667 (alteration in original). However, inherent in this conclusion is the finding that the release of asbestos resulted in a direct physical loss of or damage to property.

Considering the nature of asbestos, this is not surprising. As the Eighth Circuit has found, released asbestos fibers are a form of contamination that is

"permanent absent some intervention." *Olmsted Med. Center v. Cont'l Cas. Co.*, 65 F.4th 1005, 1011 (8th Cir. 2023) (interpreting Minnesota law). Outside of alleging that "SARS-CoV-2 virions cannot be eliminated by routine cleaning" because aerosolized COVID-19 particles are not removed from the air, BBX has not alleged any similar, permanent nature of a SARS-CoV-2 contamination. Indeed, BBX alleges SARS-CoV-2 virions may be detected in aerosols for as little as "up to three hours," and the longest period that BBX alleges the coronavirus can remain on "some" surfaces is merely weeks. *See Lindenwood Female College v. Zurich Am. Ins. Co.*, 61 F.4th 572, 573-74 (8th Cir. 2023) ("[W]e have not held that allegations of the virus's presence, standing alone, satisfy the *Oral Surgeons* standard" which requires "some physicality to the loss or damage of property – *e.g.* a physical alteration, physical contamination, or physical destruction." (quoting *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141, 1144 (8th Cir. 2021)). Thus, this differing form of contamination also renders *German St. Vincent* unhelpful for BBX. To summarize, contrary to BBX's assertions, not only is *German St. Vincent* distinguishable in critical ways, it also expresses no opinion as to the proper meaning of the phrase "direct physical loss of or damage" to property.

BBX does not stop there, however. In support of its argument that its "allegations that viral particles were present and/or threatened to be repeatedly introduced into its premises during March and April 2020 suffices to show physical loss or damage to property," BBX cites to other Missouri cases and Federal trial court decisions. All of these cases are unpersuasive, however.

24

The first case cited, *Scott Craven DDS PC v. Cameron Mut. Ins. Co.*, No. 20CY-CV06381, 2021 WL 1115247 (Mo. Cir. Mar. 9, 2021), is a circuit court decision not binding upon us. BBX also relies on *Studio 417, Inc. v. Cincinnati Ins. Co.*, 478 F.Supp.3d 794 (W.D. Mo. 2020), *Blue Springs Dental Care, LLC v. Owners Ins. Co.*, 488 F.Supp.3d 867 (W.D. Mo. 2020), *NeCo, Inc. v. Owners Ins. Co.*, 520 F.Supp.3d 1175 (W.D. Mo. 2021), and *Mehl v. Travelers Home and Marine Ins. Co.*, No. 4:16 CV 1325 CDP, 2018 WL 11301983 (E.D. Mo. May 2, 2018). These cases are all distinguishable in significant ways.

First, unlike some of the Policies here, the policies at issue in *Studio 417*, *Blue Springs*, and *NeCo* did not contain either a virus or communicable disease exclusion. Significantly, this fact was utilized in both *Blue Springs* and *NeCo* to distinguish themselves from other decisions granting dismissal on COVID-19 insurance claims. *See Blue Springs*, 488 F.Supp.3d at 870 n.2; *NeCo*, 520 F.Supp.3d at 1181 n.6. Additionally, while the Policies here plainly exclude loss of use, the policy at issue in *Mehl* expressly provided coverage for loss of use. *See Mehl*, 2018 WL 11301983, at *1. Lastly, we note that both *Studio 417* and *Blue Springs*, upon which *NeCo* itself relies, were either disagreed with or departed from in both *Zwillo* and *Seoul Taco Holdings*. *See Zwillo*, 504 F.Supp.3d at 1043; *Seoul Taco Holdings*, 538 F.Supp.3d at 932-33.[13] As part of its reasoning in

---

[13] We also note that BBX relies on the decision in *BBMS, LLC v. Cont'l Cas. Co.*, 504 F.Supp.3d 1044 (W.D. Mo. 2020) due to its discussion of *German St. Vincent*. BBX claims that *BBMS* supports its position. On the contrary, *BBMS* simply underscores the physicality element that BBX seeks to avoid. Indeed, in discussing *German St. Vincent*, *BBMS* describes it as one of two cases where "an event caused damage to, physical contact

disagreeing with said cases, *Zwillo* pointed out that the courts in both *Studio 417* and *Blue Springs* recognized the persuasive value that subsequent caselaw in that area may have on their rulings. *Zwillo*, 504 F.Supp.3d at 1043. *Zwillo* also explained that "[t]he main distinction" between itself and said cases is that the policy at issue in *Zwillo* contained an applicable exclusion. *Id.* With respect to *Seoul Taco Holdings*, the court simply recognized that "[o]ther Missouri district court cases, and the majority of the other district courts across the country . . . have found that insurance coverage is not available under the terms of the Policy or similar policies." *Seoul Taco Holdings*, 538 F.Supp.3d at 933. We find *Zwillo* and *Seoul Taco Holdings*' reasoning persuasive in not following this line of cases, and we choose to follow suit.

Because of the unconvincing nature of these cited cases, BBX's utilization of same to argue a divergence in Missouri caselaw, and thus an ambiguity regarding the interpretation of the pertinent policy language, falls flat. Moreover, we find nothing ambiguous about the term "direct physical loss of or damage to" property as used in the Policies. We refuse to, and in fact cannot, "'unreasonably distort the language of a policy or exercise inventive powers for the purpose of creating an

---

with, or had a physical impact on the insured premises." 504 F.Supp.3d at 1049. As explained *supra*, it is evident how the release of asbestos has such a physical effect, as opposed to COVID-19 as pled by BBX. Additionally, the purpose of *BBMS*'s citation to *German St. Vincent* was to demonstrate the inadequacy of the plaintiff's complaint, in that it failed to include even basic allegations about anything "physical" in connection with the business, such as a physical infestation. *Id.* at 1050-51. But as discussed extensively *supra*, even the mere presence of COVID-19 on the insured properties is not enough to show direct physical loss of or damage to such properties.

ambiguity when none exists.'" *Sachtleben*, 687 S.W.3d at 630 (quoting *Todd*, 223 S.W.3d at 163). But that is exactly what BBX is advocating we do. BBX claims its interpretation is reasonable, but in reality, it would completely remove the "physical" requirement for the coverages sought. Instead, "[w]e must endeavor to give each provision a reasonable meaning and to avoid an interpretation that renders some provisions useless or redundant." *Doe Run Res. Corp. v. Certain Underwriters at Lloyd's London, et al.*, 400 S.W.3d 463, 474 (Mo. App. E.D. 2013) (citing *Wildflower Cmty. Ass'n, Inc. v. Rinderknecht*, 25 S.W.3d 530, 534 (Mo. App. W.D. 2000)). In doing so, we reach the conclusion that BBX failed to allege "direct physical loss of or damage to" the Insured Properties as required.[14] Accordingly, the trial court did not err in granting the Insurers' motions for judgment on the pleadings with respect to BBX's claims based on direct physical loss or damage.

Point III is denied.

### Points II and I

BBX's remaining Points on Appeal concern the coverage provided under the Loss of Attraction Endorsement. It is undisputed that physical loss or damage to property is not required to obtain coverage under such Endorsement. As such,

---

[14] BBX further cites to a myriad of non-COVID-19 caselaw from other jurisdictions in support of its argument "that policy language similar to 'direct physical loss of or damage to property' was satisfied in comparable circumstances where a property owner lost or was deprived of the use of his or her property by the presence of various harmful or noxious substances." However, such caselaw is not binding on our court. Under the caselaw discussed herein applying Missouri law, we find BBX has failed to allege the requisite direct physical loss of or damage to the Insured Properties.

BBX claims that regardless of whether coverage is available to it under the Master BI coverages, it is still entitled to coverage under the Loss of Attraction Endorsement. Therefore, in challenging the grant of the Insurers' motions for judgment on the pleadings, BBX asserts in Point I that the trial court wrongly concluded that the provisions of the Loss of Attraction Endorsement were negated by certain exclusions. In Point II, BBX contends the trial court erred in granting the Excess Insurers' motions for judgment on the pleadings because the court "wrongly interpreted the Loss of Attraction Endorsement and the $5,000,000 per occurrence sub-limit" that applies to it. We will address each Point in turn.

**Point II**

BBX's second Point on Appeal challenges the trial court's grant of the Excess Insurers' motions for judgment on the pleadings,[15] claiming the court "wrongly interpreted the Loss of Attraction Endorsement and the $5,000,000 per occurrence sub-limit" that applies to it. Specifically, BBX argues "that, under the trial court's interpretation, the Excess Carriers could never be liable to pay for Loss of Attraction losses, despite accepting premiums for agreeing to extend such coverage, and in that such an interpretation renders that coverage illusory and

---

[15] Within the Insurers' Joint Motion for Judgment on the Pleadings, Allied World and Interstate did not include as a ground for dismissal this Loss of Attraction sub-limit argument. However, Allied World included this argument in its Reply Supplemental Suggestions in Further Support of its Motion for Judgment on the Pleadings, and both Insurers were included within the Defendant Excess Insurers' Joint Rebuttal Suggestions in Further Support of Their Motions for Judgment on the Pleadings, wherein this argument was further presented. Both of these pleadings were considered by the trial court, as explicitly stated in its judgment.

meaningless." BBX's argument is defeated by the clear and unambiguous language of the Policies.

The Excess Insurers provide "excess" insurance coverage that is triggered, i.e., attaches, at various monetary amounts. It is only when this attachment point is reached for any particular coverage that the liability of the Excess Insurers is implicated. It is undisputed that the lowest attachment point among all the Excess Insurers is $10,000,000. It is further undisputed that coverage for Loss of Attraction has a sub-limit of $5,000,000 per occurrence. Because this sub-limit amount falls well below that of any Excess Insurers' attachment point, the trial court held "Excess Insurers cannot be liable for providing Loss of Attraction coverage as a matter of law." We agree.

As stated in the Master Policy's "Program Limits of Liability" provision, "The participating company(ies) shall not be liable for more than *their proportion* of $150,000,000 *for any one occurrence*, except: . . . C. Sublimits. The following sublimits are part of and not in addition to the policy limit of liability: . . . $5,000,000 Loss of Attraction *per occurrence*[.]" (emphasis added). Importantly, the Master Policy's "Participation Page" provides that "[t]he *collective* liability of Insurers shall not exceed the Limit of Liability or *any appropriate Sublimit of Liability* or any Annual Aggregate limit." (emphasis added). No annual aggregate limit applies to Loss of Attraction coverage.

In reading these provisions together, we reach the same conclusion as the trial court. Indeed, the *maximum* amount BBX can receive from the Insurers

29

collectively for Loss of Attraction coverage is $5,000,000 *per occurrence*. The Excess Insurers' liability for *any one* occurrence on any given coverage is triggered at their respective attachment points, the lowest of which is $10,000,000. Accordingly, Excess Insurers cannot be liable for Loss of Attraction coverage, as the $5,000,000 per occurrence sub-limit for such coverage is well below the Excess Insurers' attachment points for any one occurrence on that coverage.

Nevertheless, BBX attempts to circumvent this language by arguing that multiple "occurrences" caused its loss. Under this interpretation, BBX claims the Excess Insurers' layers of coverage can be reached by essentially stacking each Loss of Attraction occurrence. In so arguing, BBX ignores the plain language of the Policies. No matter how many occurrences exist, each individual occurrence is limited to $5,000,000, an amount that is below the Excess Insurers' attachment points for any one occurrence. It is therefore immaterial whether multiple occurrences existed, as the Insurers' respective liabilities for *each* occurrence is considered separately.[16] As such, the trial court did not err in granting Excess Insurers' motions for judgment on the pleadings on this ground and dismissing BBX's claims based on Loss of Attraction coverage.

Point II is denied.

---

[16] In refuting this argument by BBX, Excess Insurers also relied on the "Reinstatement" provision of the Policies, which states, "With the exception of loss caused by perils which are subject to annual aggregate limits as noted in Section 3, no loss hereunder shall reduce the amount of this policy."

**Point I**

In its first Point on Appeal, BBX challenges the grant of Insurers' motions for judgment on the pleadings "because BBX stated viable claims under the proper legal standards governing insurance contracts in that the trial court wrongly concluded the broad and unique provisions of the specially negotiated coverage afforded by the Loss of Attraction Endorsement were negated and effectively rendered illusory by certain exclusions."

Of the exclusions addressed by the trial court, we note that several were included in Policies issued by certain Excess Insurers.[17] In light of our holdings in Points III and II, we need not address said exclusions, as Excess Insurers are entitled to judgment as a matter of law as to the Loss of Attraction Endorsement and the other Master BI coverages as discussed in Point III. Therefore, in resolving Point I, we only address the exclusions discussed by the trial court which were raised by the Primary Insurers, and more specifically, Scottsdale, Endurance, Interstate, Ironshore, and Beazley.[18]

---

[17] Specifically, Everest's Seepage and/or Pollution and/or Contamination Exclusion; SRU Insurers' Seepage/Pollution/Contamination Exclusion; AXIS' Nuclear, Chemical and Biological Exclusions; QBE and Arrowhead Insurers' Nuclear, Biological, Chemical and Radiological Hazards Exclusion; Evanston's Organic Pathogen Exclusion, and; the Master Policy's Mold, Mildew & Fungus Clause And Microorganism Exclusion (MAP) (Time Limit and Sublimit). With respect to the latter exclusion, we note that some of the Primary Insurers do raise said exclusion. However, with the exception of Interstate, analysis of said exclusion as it relates to the Primary Insurers is unnecessary due to other applicable exclusions and/or our denial of Point III, as will be discussed herein.

[18] As explained in footnote 11, *supra*, Arch (a Primary Insurer) paid out its coverage under the Loss of Attraction Endorsement.

31

Critical for this particular analysis are the principles of insurance policy interpretation pertaining to exclusions and endorsements. "Definitions, exclusions, conditions and endorsements are necessary provisions in insurance policies. If they are clear and unambiguous within the context of the policy as a whole, they are enforceable." *Todd*, 223 S.W.3d at 163. On the other hand, if there are ambiguities, they are resolved in favor of the insured. *See Burns*, 303 S.W.3d at 509. "Missouri also *strictly* construes exclusionary clauses against the drafter, who also bears the burden of showing the exclusion applies." *Id.* at 510 (citations omitted). However, "[t]erms within an insurance policy do not become ambiguous merely due to the presence of an exclusion." *Seaton*, 574 S.W.3d at 248 (citing *Maxam v. Am. Family Mut. Ins. Co.*, 504 S.W.3d 124, 129 (Mo. App. W.D. 2016)). Indeed, as our Supreme Court has held,

> Insurance policies customarily include definitions that limit words used in granting coverage as well as exclusions that exclude from coverage otherwise covered risks. While a broad grant of coverage in one provision that is taken away by a more limited grant in another may be contradictory and inconsistent, the use of definitions and exclusions is not necessarily contradictory or inconsistent. The principle enunciated in *Behr*[19] is more accurately stated as follows: "Though it is the duty of the court to reconcile conflicting clauses in a policy so far as their language reasonably permits, when reconciliation fails, inconsistent provisions will be construed most favorably to the insured."[] *Bellamy v. Pacific Mut. Life Ins. Co.*, 651 S.W.2d 490, 496 (Mo. banc 1983). Courts may not unreasonably distort the language of a policy or exercise inventive powers for the purpose of creating an ambiguity when none exists. *Dieckman v. Moran*, 414 S.W.2d 320, 321 (Mo. 1967).

*Todd*, 223 S.W.3d at 162-63 (footnote omitted).

---

[19] *Behr v. Blue Cross Hosp. Serv., Inc., of Mo.*, 715 S.W.2d 251 (Mo. banc 1986).

With respect to endorsements, they are "designed to amend the form policy 'to suit the needs of the insured or the insurer or to satisfy particular state requirements.'" *Grable*, 280 S.W.3d at 108 (quoting DONALD S. MALEDA & ARTHUR L. FLITNER, COMMERCIAL GENERAL LIABILITY 109 (3d ed. 1990)). Importantly, "[t]he terms and conditions of the policy are modified and altered to the extent called for by the endorsement." *Id.* (citations omitted). In general, "'[i]f the language of the endorsement and the general provisions of the policy conflict, the endorsement will prevail, and the policy remains in effect as altered by the endorsement.'" *Id.* (quoting *Abco Tank & Mfg. Co. v. Fed. Ins. Co.*, 550 S.W.2d 193, 198 (Mo. banc 1977)) (other citations omitted).

*Grable* provides an excellent example of the modifying effect of endorsements. There, the form policy included "Exclusion e" which operated to exclude from coverage bodily injury to an "employee" of the insured. 280 S.W.3d at 106. As defined in the definitions section of the form policy, "employee" included a "leased worker" but did *not* include a "temporary worker," the definition of which was separately provided as "a person who is furnished to you to substitute for a permanent 'employee' on leave or to meet seasonal or short-term workload conditions." *Id.* at 106-07. It was undisputed that the plaintiff would fall within this definition of "temporary worker" under the form policy. *Id.* at 106 n.2.

However, an endorsement attached to the form policy purported to "replace" Exclusion e. *Id.* at 107. Under this new Exclusion e, bodily injury to an "employee" was still excluded, but, with respect to that endorsement only, the definition of

33

"employee" was also replaced with a broader definition, to wit: "'**Employee**' shall include, but is not limited to, any person or persons hired, loaned, leased, contracted, or volunteering for the purpose of providing services to or on behalf of any insured, whether or not paid for such services and whether or not an independent contractor." *Id.* Citing this endorsement, the defendant insurer moved for summary judgment on the ground that plaintiff, who undisputedly was a "temporary worker," fell within the definition of "employee" contained therein, such that coverage was excluded. *Id.* at 105.

On appeal from the summary judgment entered against them, the plaintiffs claimed that the endorsement's definition of "employee" conflicted with the form policy's definition of "employee," which excluded a "temporary worker," and "that the ambiguity so created required construction of the policy in favor of coverage of a temporary worker." *Id.* The Eastern District disagreed, finding no ambiguity, as "[t]he definition in the endorsement replaces and supersedes the definition in the CGL form policy; it does not conflict with it." *Id.* at 108. Specifically, the court found the endorsement unequivocally stated it was replacing Exclusion e in the form policy with a new Exclusion e, and further clearly provided that the definition of "employee" under the endorsement was different from the definition of "employee" under the form policy. *Id.* The court then found that the endorsement's broad definition clearly contemplated a temporary worker. *Id.*

Importantly, in so holding, the Eastern District determined that "the endorsement is not ambiguous on the theory that it takes away coverage that was

34

promised in the form policy." *Grable*, 280 S.W.3d at 108. The court pointed to our Supreme Court's decision in *Todd* as having "addressed this argument and clarified that exclusions and definitions do not make an insurance policy ambiguous because they limit or exclude coverage given in the form policy." *Id*. (citing *Todd*, 223 S.W.3d at 162-63).

In this case, the Master Policy comports with these general principles. Though the Master Policy includes the Loss of Attraction Endorsement, it also includes Endorsement 1, which, by its plain terms, addresses when endorsements added by a particular Insurer will supersede the Master Policy's provisions. Specifically, Endorsement 1 of the Master Policy provides:

> In addition to each Company(ies)'s Declaration's Page (excluding any pre-printed terms and conditions), Price, Renewal, Premium Credits, Premium Payment Conditions, State Statute Amendatory Endorsements, Producer Compensation Notices / Disclosures and Service of Suit Clauses, if applicable; *the following Company(ies)'s endorsements, forms, exclusions, etc. . . are added and apply only towards the individual Company(ies) to which such is noted.* No other Company(ies) may claim such wording as their own, whether more or less restrictive, in the event of loss to apply against all recovery.
>
> The terms and conditions contained within this policy *shall supersede* those of any General Policy Conditions; General Property Conditions; terms and conditions within a Policy Jacket; Fire Policy Form; terms and conditions of the Declarations Page which conflict with the policy; and any other *endorsements or conditions added by the Company(ies)* upon policy's issuance or thereafter which are *not noted in the above paragraph* or *listed below* or have not been previously advised and agreed to by the Insured.

(Emphasis added). The plain language of the second paragraph of Endorsement 1 thus advises insureds (including BBX) that endorsements or conditions added to the Master Policy by a specific Insurer that are (i) "listed below," or (ii) "noted in

35

the above paragraph" (referring to the first paragraph) is not superseded by the Master Policy, and will instead supersede conflicting terms of the Master Policy. The "listed below" reference directs an insured to a list of Insurers on Endorsement 1, and to specific endorsements each listed Insurer intends to add to the Master Policy. The "noted in the above paragraph" reference directs an insured to look in the preceding paragraph to find noted endorsements or conditions added by a particular Insurer.

At issue here is the Loss of Attraction Endorsement included in the Master Policy. Each of the Primary Insurers' Policies, except for Ironshore and Beazley's,[20] include this Endorsement, the eleventh of twelve endorsements listed in the Master Policy, at the time of policy issuance. In relevant part, the Loss of Attraction Endorsement provides:

> This policy is extended to cover the actual loss sustained and Extra Expense Incurred by the insured resulting from cancellation of or inability to accept bookings for accommodation and/or cessation or diminution of trade due to a loss of potential customers, as a direct result of:
>
> . . .
>
> 2) Infectious, communicable or contagious disease.
>
> . . .
>
> 4) closing of the whole or part of the premises of the Insured by order of a Public Authority consequent upon the existence or threat of hazardous conditions either actual or suspected at an Insured Location to the extent such closure is not otherwise covered elsewhere

---

[20] BBX contends that Beazley did not properly delete the Loss of Attraction Endorsement from its Policy. We disagree, for the reasons that will be explained later in this Point. We do note that in BBX's Petition, it alleges in paragraph 181 that the Policies, "with the exception of the Beazley and Ironshore Policies," include the Loss of Attraction Endorsement.

36

under this Policy such as under the Civil or Military Authority Extension[.]

BBX asserts its claims against Scottsdale, Endurance, and Interstate are covered under the Loss of Attraction Endorsement, which undisputedly does not require physical loss or damage to obtain coverage. Regardless, Scottsdale, Endurance, and Interstate argue that certain exclusions within their Policies preclude *all* coverage sought by BBX, including under the Loss of Attraction Endorsement. We will examine each of these exclusions in turn.

### *Scottsdale's* **Exclusion of Loss Due to Virus or Bacteria**

Scottsdale's Policy includes an Exclusion of Loss Due to Virus or Bacteria, added through an endorsement. Said exclusion is expressly listed under Scottsdale's name on Endorsement 1, and is therefore not superseded by the terms and conditions of the Master Policy, and instead supersedes the provisions of the Master Policy, in accordance with the plain language of Endorsement 1. In relevant part, the Scottsdale exclusion provides:

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

A. The exclusion set forth in Paragraph B. applies to *all coverage* under *all forms and endorsements that comprise this Coverage Part or Policy*, including but not limited to forms or endorsements that cover property damage to buildings or personal property and *forms or endorsements that cover business income, extra expense or action of civil authority*.

B. We will *not* pay for *loss or damage caused by or resulting from any virus*, bacterium or other micro-organism that induces or is capable of inducing physical distress, illness or disease.

37

(Emphasis added).

The language of the exclusion is clear and unambiguous. It applies to all coverage provided within Scottsdale's Policy, which necessarily includes the Loss of Attraction Endorsement, and clearly states that loss or damage caused by or resulting from any virus will not be covered. As alleged in its Petition, all of BBX's claimed losses were caused by or resulted from the SARS-CoV-2 virus and COVID-19. Therefore, Scottsdale's Exclusion of Loss Due to Virus or Bacteria clearly and unambiguously applies to exclude all of BBX's claims for coverage, including under the Loss of Attraction Endorsement.

Significantly, BBX does not argue that Scottsdale's exclusion does not apply to its claims; rather, BBX asserts that the language of the Loss of Attraction Endorsement and that of the exclusion are in conflict, thereby resulting in an ambiguity that must be resolved in favor of BBX. Specifically, BBX argues that "[o]n the one hand, Scottsdale agrees to pay for loss as a direct result of a disease; on the other, Scottsdale refused to pay for loss resulting from a virus that causes disease." In so arguing, BBX utilizes the principle that "[w]here a policy 'promises the insured something at one point but then takes it away at another, there is an ambiguity.'" *Golden Rule Ins. Co. v. R.S.*, 368 S.W.3d 327, 334 (Mo. App. W.D. 2012) (quoting *Chamness v. Am. Family Mut. Ins. Co.*, 226 S.W.3d 199, 204 (Mo. App. E.D. 2007)).[21]

---

[21] BBX makes this argument only as to subsection 2) of the Loss of Attraction Endorsement, and not as to subsection 4).

This is a faulty application of said principle, as explained by our Supreme Court: "While a broad grant of coverage in one provision that is taken away by a more limited grant in another may be contradictory and inconsistent, the use of definitions and exclusions is not necessarily contradictory or inconsistent." *Todd*, 223 S.W.3d at 163. In fact, *Grable* refuted this exact argument with respect to an endorsement, as discussed above. *See Grable*, 280 S.W.3d at 108 (citing *Todd*, 223 S.W.3d at 163-63 in stating, "The Missouri Supreme Court has addressed this argument and clarified that exclusions and definitions do not make an insurance policy ambiguous because they limit or exclude coverage given in the form policy.").

This is not a situation where a broad grant of coverage is taken away by another, more limited grant of coverage. Instead, this involves an exclusion, which "exclude[s] from coverage otherwise covered risks." *Todd*, 223 S.W.3d at 163. "Terms within an insurance policy do not become ambiguous merely due to the presence of an exclusion." *Seaton*, 574 S.W.3d at 248 (citing *Maxam*, 504 S.W.3d at 129). While the Loss of Attraction Endorsement covers certain loss "as a direct result of: . . . Infectious, communicable or contagious disease[,]" Scottsdale's exclusion clearly and unambiguously excludes from coverage "loss or damage *caused by or resulting from* any virus . . . ." The SARS-CoV-2 virus causes COVID-19. Thus, the exclusion applies to bar this otherwise covered risk, and likewise any coverage existing under subsection (4) of the Endorsement to the extent

39

"hazardous conditions either actual or suspected at an Insured Location" were caused by or resulted from the SARS-CoV-2 virus.

We further note that the trial court did not "obliterate" the Loss of Attraction Endorsement by applying the Scottsdale exclusion, as BBX asserts. The application of said exclusion in this instance only serves to limit or preclude coverage under two of the Endorsement's *seven* individual subsections. Thus, Loss of Attraction coverage under the Scottsdale Policy is still available to BBX via the remaining five subsections, if the conditions of same are satisfied.

The trial court did not err in holding Scottsdale's Exclusion of Loss Due to Virus or Bacteria applied to preclude coverage for BBX's alleged losses under all forms and endorsements of Scottsdale's Policy, including the Loss of Attraction Endorsement.

### *Endurance's* Communicable Disease Exclusion

Endurance's Policy contains a Communicable Disease Exclusion, added through endorsement to its issuance of the Master Policy. In relevant part, Endurance's Communicable Disease Exclusion provides:

> **THIS ENDORSEMENT CHANGES THIS POLICY, PLEASE READ IT CAREFULLY.**
>
> This Policy excludes any loss, expense, cost or damage directly or indirectly arising out of, contributed to by, or resulting from, in whole or in part, the actual or alleged transmission of a "communicable disease", or threat thereof, including any cost or expense arising out of or related to testing for, prevention of, failure to report the disease to governmental authorities, monitoring, cleaning up, removing, containing, treating, or neutralizing the "communicable disease".

"Communicable disease", as used in this endorsement, means any sickness or malady capable of being transmitted.

All other terms and conditions of this policy shall remain unchanged.

This exclusion is specifically listed under Endurance's name on Endorsement 1 of the Master Policy. For the same reasons explained in connection with Scottsdale's exclusion listed on Endorsement 1, Endurance's Communicable Disease Exclusion is not superseded by the terms and conditions of the Master Policy, and instead supersedes the provisions of the Master Policy, in accordance with the plain language of Endorsement 1.

The language of Endurance's exclusion clearly and unambiguously applies to bar coverage of BBX's alleged COVID-19-related losses under Endurance's Policy. As alleged in BBX's Petition, COVID-19 fits comfortably within Endurance's definition of a "communicable disease." BBX does not dispute this. Instead, BBX raises the same ambiguity argument that it asserted with respect to Scottsdale's exclusion, claiming Endurance's exclusion "acted to nullify the express coverage grant in the Loss of Attraction Endorsement, which in Subsection (2) specifically provides coverage for losses as a 'direct result of . . . [i]nfectious, communicable or contagious disease." However, as our discussion above demonstrates, this argument fails, as exclusions may "exclude from coverage otherwise covered risks." *Todd*, 223 S.W.3d at 163. Nor does the Endurance exclusion nullify the Loss of Attraction Endorsement, considering it may preclude coverage under only two of the seven individual subsections, as explained above.

41

Accordingly, the trial court did not err in holding BBX's claimed losses are unambiguously excluded under Endurance's Communicable Disease Exclusion.

***Interstate's* Exclusions**

Interstate's Policy also contains a Communicable Disease Exclusion. Although referred to on its Declarations Page, Interstate's Communicable Disease Exclusion is not (i) "listed below," or (ii) "noted in the above paragraph" (referring to the first paragraph) on Endorsement 1 to the Master Policy, as Endurance's exclusion is. The only Interstate endorsement "listed below" in Endorsement 1 of the Master Policy is its Market Follow-On Endorsement, which does not include therein the Communicable Disease Exclusion. And though the first paragraph of Endorsement 1 notifies insureds that Declaration Pages are unique to each Insured, the mere reference to an Insured's Declaration Page does not serve to "note" specific endorsements or conditions in the first paragraph of Endorsement 1 that will supersede the Master Policy. Consequently, per the language of Endorsement 1, Interstate's Communicable Disease Exclusion is superseded by the terms and conditions of the Master Policy and does not apply to bar coverage for BBX's alleged losses under the Loss of Attraction Endorsement. As such, the trial court erred in holding BBX's claimed losses are unambiguously excluded under Interstate's Communicable Disease Exclusion.

Nevertheless, Interstate's Policy does include an additional exclusion that Interstate argues bars BBX's alleged losses: the Pollution Contamination Exclusion. This exclusion *is* included within Interstate's Market Follow-On

42

Endorsement listed under Interstate's name on Endorsement 1 of the Master

Policy and thus is not superseded by the terms and conditions of the Master Policy.

The Pollution Contamination Exclusion provides, in pertinent part:

> This Endorsement modifies the Commercial Property Coverage to which it is attached.
>
> . . .
>
> 5.    **EXCLUSIONS CLAUSE**:
>
> We will not pay for loss, damage, cost or expense caused directly or indirectly by any of the following sub-clauses A through I, inclusive, and any such loss, damage, or expense is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss, and the terms and conditions of coverage shall be limited or adjusted as may be provided for in the following sub-clauses A through I, inclusive:
>
> . . .
>
> B.    Pollution Contamination Exclusion
>
> The release, migration, discharge, escape or dispersal of Contaminants.   However, we will provide coverage for Contaminants, pursuant to the other terms, conditions and exclusions of the Policy,[22] to the extent that the Policy affirmatively provides coverage for any loss, cost, damage or expense:
>
> (i)    arising directly from the release, migration, discharge, escape or dispersal of Contaminants directly caused by or resulting from a peril not otherwise excluded under the Policy which resulted in a Covered Loss, or
>
> (ii)    resulting in a Covered Loss caused by a peril not otherwise excluded under the Policy which arises directly from the release, migration, discharge, escape or dispersal of Contaminants, or

---

[22] The Definitions Clause of the Market Follow-On Endorsement defines "Policy" as "the Commercial Property Coverage or other insuring agreement to which this Endorsement applies."

43

(iii)    arising directly from Contaminants as long as such affirmative coverage under the Policy is subject to a sublimit of liability, then we shall only provide coverage for loss, damage, cost or expense directly caused by such peril in proportion to the sublimit in the Policy.

In this exclusion B, the capitalized term "Contaminants" means materials that may be harmful to human health and include any impurity, pollutant, poison, toxin, pathogen or pathogenic organism, disease-causing or illness-causing agent, asbestos, dioxin, polychlorinated biphenyls, agricultural smoke, agricultural soot, vapor, fumes, acids, alkalis, bacteria, *virus*, and hazardous substances as listed in the Federal Water Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, Toxic Substances Control Act, or as designated by the United States Environmental Protection Agency or any other local governmental agency. However, Contaminants do not include any form of fungus, including but not limited to, yeast, mold, mildew, rust, smut, mushroom, spores, mycotoxins, odors, or any other substances, products, or byproducts produced by, released by, or arising out of the current or past presence of any of the foregoing.

(Emphasis added).

At first glance, the plain language of the Pollution Contamination Exclusion appears to exclude coverage under the Loss of Attraction Endorsement. Indeed, the exclusion excludes payment for loss, damage, cost or expense caused directly or indirectly by the release, migration, discharge, escape or dispersal of Contaminants. The definition of Contaminants includes any virus. As alleged in BBX's Petition, this plainly applies to the SARS-CoV-2 virus and the "pandemic spread of" same. Considering the SARS-CoV-2 virus causes COVID-19, the exclusion appears to bar coverage of BBX's alleged losses related to the "pandemic spread of" the SARS-CoV-2 virus and COVID-19, which necessarily includes losses related to the governmental closure orders.

However, the Pollution Contamination Exclusion also contains three exceptions, the third of which is significant here. It states:

> [Interstate] *will* provide coverage for Contaminants, pursuant to the other terms, conditions and exclusions of the Policy, to the extent that the Policy affirmatively provides coverage for any loss, cost, damage or expense . . . arising directly from Contaminants as long as such affirmative coverage under the Policy is subject to a sublimit of liability, then we shall only provide coverage for loss, damage, cost or expense directly caused by such peril in proportion to the sublimit in the Policy.

(Emphasis added). Stated differently, if 1) Interstate's Policy affirmatively provides coverage for any loss, cost, damage or expense arising directly from a virus, and 2) such coverage is subject to a sublimit, then Interstate will provide coverage for loss directly caused by a virus in proportion to that sublimit, pursuant to other terms, conditions and exclusions of the Interstate Policy.

This language clearly contemplates the coverage afforded under the Loss of Attraction Endorsement. Indeed, the Loss of Attraction Endorsement affirmatively provides coverage for certain losses "as a direct result of . . . Infectious, communicable or contagious disease." COVID-19 is such a disease and is caused by the SARS-CoV-2 virus. Thus, the Loss of Attraction Endorsement "affirmatively provides coverage for . . . loss, cost, damage or expense . . . arising directly from [a virus] . . . ."[23] Moreover, Loss of Attraction coverage is subject to a $5,000,000 per occurrence sublimit. As such, the requirements of the third exception to Interstate's Pollution Contamination Exclusion are satisfied.

---

[23] The same can be said for the coverage existing under subsection (4) of the Loss of Attraction Endorsement to the extent the SARS-CoV-2 virus constitutes "hazardous conditions either actual or suspected at an Insured Location[.]"

Barring any other applicable terms, conditions and exclusions of the Interstate Policy, Interstate is therefore required by the plain language of the Pollution Contamination Exclusion to provide BBX coverage for loss, damage, cost or expense directly caused by viruses "in proportion to the sublimit in the Policy." The only other exclusion Interstate directs us to is its Communicable Disease Exclusion, which, as already discussed, is superseded by the Master Policy. Consequently, Interstate's Communicable Disease Exclusion does not render the third exception to the Pollution Contamination Exclusion inapplicable.

Having addressed the Pollution Contamination Exclusion, we further observe that Interstate's Policy also includes the Mold, Mildew & Fungus Clause And Microorganism Exclusion (MAP Exclusion) (Time and Sublimit) found in Endorsement 3 of the Master Policy, an exclusion that the trial court held precludes BBX's COVID-19 claims under both the Master BI coverages and the Loss of Attraction Endorsement. It is therefore necessary to address whether this MAP Exclusion would render the coverage provided under the Pollution Contamination Exclusion's third exception inapplicable.

The Master Policy's MAP Exclusion is found in Endorsement 3 of the Master Policy. Endorsement 3 provides, in relevant part:

**ENDORSEMENT #3**

The following provisions are hereby attached to and made part of this Policy:

**Mold, Mildew & Fungus Clause And Microorganism Exclusion (MAP) (Time Limit and Sublimit)**

46

A.  This Policy only insures physical loss or damage to insured property by mold, mildew or fungus when directly caused by a peril insured by this Policy occurring during the Policy Period.

. . .

B.  Except as set forth in the foregoing Section A., This Policy does not insure any loss, damage, claim, cost, expense or other sum directly or indirectly arising out of or relating to:

Mold, mildew, fungus, spores or *other microorganism of any type, nature or description, including but not limited to any substance whose presence poses an actual or potential threat to human health.*

This Exclusion applies regardless of whether there is:

(i)   any physical loss or damage to insured property;

(ii)  any insured peril or cause, whether or not contributing concurrently or in any sequence;

(iii) any loss of use, occupancy or functionality; or

(iv)  any action required, including but limited to repair, replacement, removal, cleanup, abatement, disposal, relocation or steps taken to address medical or legal concerns.

ALL OTHER TERMS AND CONDITIONS REMAINING UNCHANGED.

(Emphasis added).

Accordingly, as is relevant here, the MAP Exclusion precludes coverage for "any loss, damage, claim, cost, expense or other sum directly or indirectly arising out of or relating to . . . other microorganisms of any type, nature or description, including but not limited to any substance whose presence poses an actual or potential threat to human health." The critical term here is "microorganism," which is undefined. In such circumstances, we would typically look to the dictionary to determine the term's plain meaning, but as the parties' briefing and

our own research demonstrates, "microorganism" is subject to multiple definitions, some of which include viruses while others do not. "However, a term in an insurance policy is not ambiguous simply because the term has more than one definition." *Scottsdale Ins. Co. v. Olivares*, 614 S.W.3d 65, 71 (Mo. App. W.D. 2020) (citing *Taylor v. Bar Plan Mut. Ins. Co.*, 457 S.W.3d 340, 346 (Mo. banc 2015)). "The question here is not which of several dictionary definitions should prevail, but rather whether the average layperson would reasonably understand the term [microorganism] to include a [virus]." *Id.*

Considering the broad language of the MAP Exclusion, specifically its application to microorganisms "of any type, nature or description, including but not limited to any substance whose presence poses an actual or potential threat to human health[,]" it may well be that an average layperson could reasonably understand the term microorganism to include a virus. We need not decide the question, however, for even assuming the MAP Exclusion would therefore apply to independently bar coverage of BBX's claims under Interstate's Policy, including Loss of Attraction coverage, this would result in an ambiguity.

As explained, the "pandemic spread" of the SARS-CoV-2 virus constitutes "the release, migration, discharge, escape or dispersal of Contaminants" as contemplated by Interstate's Pollution Contamination Exclusion. Nevertheless, the coverage afforded under the Loss of Attraction Endorsement meets the specifications of the third exception to the Pollution Contamination Exclusion, meaning loss, damage, cost or expense directly caused by viruses *is covered* "in

48

proportion to the sublimit in the Policy." However, the language "pursuant to the other terms, conditions and exclusions of the Policy" directs the insured to the MAP Exclusion found in Endorsement 3 of the Master Policy, where its broad language could be reasonably understood to apply to *preclude* coverage for any loss directly or indirectly arising out of or relating to a virus, including Loss of Attraction coverage.

Therein lies the ambiguity. Coverage is provided by Interstate's policy for loss directly caused by viruses through a narrowly-tailored exception to an exclusion, and coverage is then excluded for loss directly or indirectly arising out of or relating to a virus by a different, broadly-worded exclusion. "An ambiguity follows when the insurance policy contains two clauses that irreconcilably contradict one another, and, consequently, the ambiguity will be resolved in favor of the insured." *Golden Rule Ins. Co.*, 368 S.W.3d at 334 (citing *Seeck*, 212 S.W.3d at 134; *Lutsky v. Blue Cross Hosp. Serv., Inc., of Mo.*, 695 S.W.2d 870, 875 n. 7 (Mo. banc 1985)). Indeed, similar circumstances occurred in *German St. Vincent*, which ultimately led the Eastern District to reverse the grant of summary judgment in favor of the insurer:

> As noted, the dust containing asbestos which caused damage to St. Vincent's property was a "pollutant" as contemplated by the policy and was released from under the old vinyl flooring. Thus, the pollution exclusion is applicable. Because the release of pollutants was caused by the floor scraper, a vehicle, the resultant damage was caused by a "specified cause[] of loss" and, consequently, covered under the exception to the pollution exclusion. However, the "specified causes of loss" are then subject to the limitation set forth in paragraph C.1.c, CAUSES OF LOSS – SPECIAL FORM, pertaining to damage caused by or resulting from various elements, including dust.

[Insurer] contends this limitation applies to exclude coverage for the dust because it did not enter through the building's roof or walls that were damaged by a "Covered Cause of Loss." Thus, an ambiguity exists in that coverage is provided for damage resulting from a "specified cause[] of loss," i.e. vehicle, and coverage is then excluded by the limitation for damage resulting from dust, except in situations where the building first sustains damage to its walls or roof. *Lutsky*[, 695 S.W.2d at 875]. In light of this ambiguity, and construing the policy so as to provide coverage rather than to defeat it, we conclude the judgment must be reversed.

54 S.W.3d at 668 (first and third alteration in original).

In following suit, we must resolve this ambiguity in favor of BBX and construe Interstate's policy in favor of coverage. In doing so, we cannot hold that Interstate was entitled to judgment as a matter of law under its Pollution Contamination Exclusion and the Master Policy's MAP Exclusion on BBX's claims for Loss of Attraction coverage. As such, the trial court erred in granting Interstate judgment as a matter of law on BBX's claims based on said coverage.

### *Ironshore's* Pollution, Contamination, and Debris Removal Exclusion Endorsement

In its Supplemental Suggestions in support of the Joint Motion for Judgment on the Pleadings, Ironshore asserts that BBX's claims would be barred under its Pollution, Contamination, Debris Removal Exclusion Endorsement. However, there is no dispute among the parties that Ironshore deleted the Loss of Attraction Endorsement from its Policy. Thus, we need not analyze whether this exclusion would bar coverage under the Loss of Attraction Endorsement as it simply does not exist. Further, in light of our denial of Point III, we need not analyze whether this exclusion, or any other exclusion, would further preclude

BBX's claims under the other Master BI coverages. The trial court did not err in granting Ironshore judgment as a matter of law.

**_Beazley's_ Special Perils Business Interruption Extension**

The Beazley Policy purports to delete the Loss of Attraction Endorsement in its entirety and replace it with the Special Perils Business Interruption Extension (the "SPBI Extension"). This is set forth in the Beazley Amendatory Endorsement, to wit: "Endorsement #11 Loss of Attraction Endorsement is deleted in its entirety and replaced by LMA5221 Special Perils Business Interruption Extension." This Beazley Amendatory Endorsement is listed in both the Schedule of All Forms and Endorsements, and Endorsement 1 in the Beazley Policy, and is thus not superseded by the terms and conditions of the Master Policy.[24]

Nevertheless, BBX contends Beazley did not properly delete the Loss of Attraction Endorsement. Specifically, BBX claims that Beazley's Binder included Loss of Attraction coverage, but when BBX received the Beazley Policy in October 2019, Beazley had "unilaterally alter[ed] the terms of coverage" through "an endorsement that was not referenced in the April 5, 2019 binder and which purported to exclude Loss of Attraction coverage." BBX argues that "any non-conforming amendments to the Beazley Policy are controlled by the Beazley

---

[24] The SPBI Extension is also listed in the Policy's Schedule of All Forms and Endorsements. We further note that the identifying number for the Beazley Amendatory Endorsement differs by one digit from the identifying number listed in connection thereto on the Schedule of All Forms and Endorsements and in Endorsement 1. However, no party takes issue with this small discrepancy, nor do we perceive any problem caused by it.

Binder" and thus concludes that it "is entitled to the coverage provided for in the Beazley Binder under Missouri law."

BBX's argument is refuted by the plain language of the Beazley Binder, which states:

> THIS BINDER WILL BE TERMINATED AND SUPERSEDED UPON DELIVERY OF THE FORMAL POLICIES OR CERTIFICATES ISSUED TO REPLACE IT. IF THERE IS ANY CONFLICT BETWEEN THE TERMS AND CONDITIONS OF THIS BINDER AND THE TERMS AND CONDITIONS OF THE POLICY (OR CERTIFICATE), WHEN ISSUED, THE TERMS AND CONDITIONS OF THE POLICY (OR CERTIFICATE) SHALL GOVERN.

Accordingly, when BBX received the Beazley Policy in October 2019, said Policy terminated and superseded the Beazley Binder. As such, the Beazley Amendatory Endorsement and the express deletion and replacement of Loss of Attraction coverage therein controls, similar to the endorsement in *Grable*. We also note that BBX's contention that the Beazley Binder did not reference the Beazley Amendatory Endorsement is simply wrong. Indeed, under "Forms and Endorsements Applicable," the Beazley Binder lists "Beazley Amendatory Endorsement – as per expiring." Further, the Beazley Policy has an effective date of April 1, 2019, and we find it significant that BBX received the Policy in October 2019, several months *prior* to the pandemic. We therefore find that Beazley properly deleted the Loss of Attraction Endorsement from its Policy through the Beazley Amendatory Endorsement and replaced it with the SPBI Extension. Consequently, BBX cannot receive Loss of Attraction coverage under the Beazley Policy as a matter of law.

However, BBX contends that it is still entitled to proceed with its claims under the SPBI Extension.  In relevant part, the SPBI Extension states:

1. It is hereby understood and agreed that this insurance is extended to include the actual loss sustained as insured under this insurance during the period of time described in 6. below *caused by the closure of or restriction of access to INSURED PREMISES by any governmental or local authority directly as a result of* any of the matters described in 1.1, 1.2, or 1.3 below:

       1.1.    *NOTIFIABLE INFECTIOUS OR CONTAGIOUS DISEASE which is manifested by any person during the period of insurance whilst on or within any INSURED PREMISES.*

   . . .

2. NOTIFIABLE INFECTIOUS OR CONTAGIOUS DISEASE shall mean any disease which can be passed from human to human or from animal to human and which is required by law in the territory where the INSURED PREMISES are located to be notified to a government or local authority.

   . . .

4. INSURED PREMISES shall mean any premises which are insured hereunder and which are under the direct ownership or control of the Insured.

. . .

6. Coverage under this Extension shall be for the period of time commencing with the date of the closure of or restriction of access to INSURED PREMISES by any governmental or local authority and ending no later than 60 days thereafter.  Such period of time shall run concurrently with and not in addition to the period of time specified in any other provision of this insurance providing cover for closure or restriction of access, whether or not such other provision is providing cover for the matters described in 1.1, 1.2 or 1.3 above.

. . .

8. The maximum amount payable in respect of all losses under this Extension arising out of 1.1, 1.2 and 1.3 above combined shall not exceed USD 5,000,000 in the aggregate.

53

. . .

10. Nothing in this Extension shall operate to override any exclusion in this insurance but not limited to exclusions for terrorism, sabotage, the actual or threatened malicious use of pathogenic or poisonous biological or chemical materials or nuclear or radioactive contamination.

BBX argues that "the policy provides coverage for losses caused by government closures directly as a result of a notifiable contagious disease." More specifically, BBX contends "[t]he policy specifies only that the notifiable contagious disease must have been present at *any* Insured Premises, but it simply does *not* include a requirement that a closure order uniquely specify an Insured Premise for closure." However, BBX's interpretation fails to consider critical language within the SPBI Extension, and is therefore at odds with the plain and unambiguous language of same.

As applicable here, the SPBI Extension covers the actual loss caused by the closure of or restriction of access to Insured Premises by any governmental or local authority directly as a result of a notifiable infectious or contagious disease which is manifested by any person during the period of insurance whilst on or within any Insured Premises. Stated differently, BBX has to allege a closure of or restriction of access to an Insured Premises by a government or local authority directly as a result of COVID-19 which was manifested by a person whilst on or within any Insured Premises. BBX has not done so.

Indeed, BBX has not alleged a closure or restriction of access to any Insured Premises by any governmental or local authority that directly resulted from a person who manifested COVID-19 whilst on or within any of its Insured Premises.

54

Rather, BBX alleges various governmental orders that were issued to the public at large. As alleged, said orders were not issued in connection to any manifestation of COVID-19 at any Insured Premises, but instead because of the pandemic and with the purpose to protect the public and prevent transmission of COVID-19. Accordingly, the trial court did not err in holding that the terms of the SPBI Extension have not been met and that no coverage under same is afforded BBX.

## Conclusion

For the foregoing reasons, the judgment of the trial court is reversed and remanded for further proceedings consistent with this opinion as to BBX's claims for Loss of Attraction coverage under Interstate's Policy. The judgment is otherwise affirmed.

_____
W. DOUGLAS THOMSON, JUDGE

All concur.